CÆSAR PETERS, ET AL., *vs.* JOHN, MATTHEW S., AND JOSEPH VAN LEAR.—*December* 1846.

The testatrix, by her will, in 1828, directed her executors to manumit, by deed, all her slaves, whose age and health might be such as their manumission may not be prohibited by law, leaving it in the discretion of the executors to carry such direction into effect, at such time or times as they may judge proper and expedient. Several of her executors renounced the trust, but one of them accepted it. After a lapse of fourteen years, a number of the slaves filed their bill against all the persons alive, named as executors, including the one who took out letters, in which they alleged, that the executors refused to execute to them deeds of manumission, although not prohibited by law, and retained them in servitude for their own profit; that the testatrix left sufficient personal estate to pay her debts, without including the complainants, and no debts unsatisfied. To this bill the defendants demurred. HELD, that the facts disclosed, presented a proper case for the interposition of a court of equity, on the general principles by which that tribunal is governed in the execution of trusts and powers.

By the statute law of *Maryland* upon the subject of slavery, a claim to freedom can only be established by the judgment of a court of law, and the petition must originate in the county where the petitioner resides, under the direction of his owner.

Chancery, in this case, cannot pronounce, by its decree, the freedom of the complainants, but may direct the executor to execute deeds of manumission, and thus enable them to assert their claim to freedom in a court of law.

By the laws of this State, a slave possesses no civil rights, and, as a general proposition, it is true, that he is incapable of instituting a suit, either in a court of law or equity.

But, by the act of 1796, ch. 67, sec. 21, he has been made capable of acquiring freedom by deed or will; his ability to assert his right to freedom is therefore recognised, though, pending the controversy, he is treated as a slave.

The complainants here are under the necessity of invoking the aid of equity, that an execution of the power created by the will may be enforced.

Slaves claiming a right to freedom under the same will, each having a common interest in arresting a perversion of a trust created by it, affecting their right, may unite in the same bill to compel the executor to perform such a trust; and it is no misjoinder.

The two executors named in the will, *who renounced*, ought not to have been made defendants, and the bill as to them should be dismissed. It was only necessary to proceed against the party whose duty it was to execute the deeds of manumission, in pursuance of the power created by the will.

Equity has no power to determine, by decree, the right to freedom, nor to order an account of the value of the services of the complainants while detained as slaves.

APPEAL from the Equity side of *Washington* county court.

The bill in this cause was filed on the 12th May 1842, by *Cæsar Peters*, *Thomas Clemens*, *Alexander Clemens*, *Henry Jones*, *Isaac Clemens*, *Nathan Mingo*, *Margaret Pierce*, and *Sophia Clemens*, colored persons, residing in *Washington* county, and alleged, that they were, during the lifetime of *Mary Van Lear*, of, &c., and at the time of her death the servants and slaves of the said *Mrs. V. L.* That in or about the year 1828, the owner of your orators departed this life, leaving her last will and testament, which contains a provision in the words following, to wit:

"*Item.*—It is my will, and I do hereby order and direct my said executors to manumit, by deed, all the slaves which may be mine at the time of my death, whose age and health may be such, as that their manumission may not be prohibited by law, leaving it in the discretion of my said executors to carry this clause into effect, at such time or times as they may judge expedient and proper."

Which was admitted to probate, and recorded on the 12th July 1828; that said last will and testament, with all its provisions, may be taken as part of this bill of complaint; that *John Van Lear, Jr., William V. L., Matthew S. V. L.*, and *J. V. L.*, were nominated and declared to be the executors of said last will and testament, in and by one of the clauses of the same; that *William Van Lear* is since deceased; that *William, Matthew* and *Joseph*, renounced and refused to act as such executors; whereupon letters testamentary were granted to *John V. L.*, the only remaining executor. That *fourteen* years have elapsed since the death of their mistress, during all which time the said executors have refused to allow to your orators any benefit of the said last will and testament, and contrary to the express intention of the said testatrix, the said executors have ever since held your orators in bondage and servitude, and have refused to execute deeds of manumission to your orators, although your orators have not been prohibited by law from being manumitted, in consequence of their age or health, or any other cause whatever. And the said executors have, ever since the death of the said

testatrix, and do now hold, your orators in servitude and slavery, although there is no reason for their doing so. That the best part of the life of many of your orators, when freedom would be of most value to them, is wearing away; and that the said executors have retained, and do still retain, your orators in servitude, for their own profit and emolument, which your orators charge is contrary to good faith, and the kind and benevolent intentions of the said testatrix; to the end, therefore, that the said *John*, *Matthew* and *Joseph*, may answer, &c. That your orators may be decreed to be free and discharged from slavery; that the executors, or one or more of them, may be required to execute to your orators deeds of manumission; that they may be allowed, under the decree of your honorable court, adequate compensation for their services, for the time during which they have been detained in slavery by the said defendants; and that they may have such other and further relief as their case may require. Prayer for subpœna, &c.

With this bill was exhibited the will of *Mary Van Lear*, the only clause of which, considered by this court, will be found in the bill of complaint.

A supplemental bill was filed alleging, that a sufficiency of personal estate of the testatrix came into the hands of her executor to pay her debts, without including the complainants in the same, and that there were no outstanding debts unsatisfied; that the testatrix charged her real estate with the payment of her debts, in order to carry into effect the manumission of the complainants. That if the personal estate is not sufficient to pay the said debts, the real is greatly more than adequate for that purpose, and that they are entitled to call upon the defendants to sell the real estate for the payment of debts, and, if necessary, that it may be decreed to be sold.

The defendants, *John*, *Matthew* and *Joseph*, appeared to the bill, and demurred to the same upon the following grounds:

1st. That the complainants have not made such a case, as entitles them in a court of equity to any relief against the defendants.

2nd. That the subject matter of their complaint is not within the jurisdiction of the court.

3rd. That the complainants are not entitled to sue these defendants, in form and manner aforesaid, by reason of the personal disability of said complainants, they being slaves, and by the laws of the land disabled to sue, except by petition in a court of law.

4th. That the complainants are improperly joined in said bill and amended bill.

5th. That the complainants, or any of them, have no right to call on the said *Matthew S. Van Lear* and *Joseph Van Lear*, two of said defendants, concerning the subject of their said suit, who have no interest therein, that can make them liable to the claims of the complainants, in manner and form as by them set forth in their said bill and amended bill; and that they, the said *Matthew* and *Joseph*, are improperly made parties, as defendants to said bill and amended bill, and do demur to the same.

6th. That the subject matter of said bill and amended bill, is cognizable only in a court of law.

7th. That by reason of the discretion vested in the said *John Van Lear*, by the last will and testament of the said *Mary Van Lear*, exhibited with said bill and amended bill, to be exercised by him as executor thereof, at such time or times as he may judge expedient or proper; the complainants, or any of them, are not entitled to their freedom, or the relief prayed by them in said bill and original bill, in any or all of the matters in which they thereby seek relief, and that being slaves, they have no title to sue as aforesaid.

8th. That said bill and amended bill are deficient in this, that they do not aver the exercise of that discretion, on which alone said complainants are entitled to the execution of the deeds of manumission claimed by them.

On the 27th November 1844, *Washington* county court, (T. BUCHANAN and MARSHALL, A. J.,) sustained the demurrer and dismissed the bill.

From this decree the complainants appealed.

The cause was argued before ARCHER, C. J., DORSEY, SPENCE, MAGRUDER and MARTIN, J.

Peters, *et al.*, *vs.* Van Lear.—1846.

By Jervis Spencer for the appellants, and
By Weisel for the appellees.

Magruder, J., delivered the following dissenting opinion:

The plaintiffs in error acknowledged themselves to be in a state of slavery, and as slaves, appear in chancery to seek redress. If they were now entitled to their freedom, it must be conceded, that they could not, while in their present condition, ask for any purpose the aid of that court. It is to get a title which they as yet have not, and then to assert that title in a court of law, that their bill of complaint is filed.

The mistress of these persons had, by her will, authorised her executors to manumit them, leaving it to those executors to judge when, consistently with the various provisions of her will, the manumission should be effected. Because, as the plaintiffs in error allege, the deeds of manumission ought before this to have been executed, and the executors think otherwise, the court of chancery is asked to decree that the deeds be executed, and that an account be taken of the value of their services, since the period when they ought to have been emancipated; and that the executors be ordered to pay to them the value of those services. Can the court of chancery entertain this bill?

The right of a person, born a slave, to his freedom, must depend upon our acts of Assembly. They must give him the right, and he must prove, that he has acquired it in some way authorised by law. The mode in which the right·is to be obtained must be prescribed by act of Assembly. The master who desires to manumit his slave, must take care in all respects to conform to the law. He may give him freedom, by deed or will, to take effect *in præsenti*, or, *in futuro*. This, because the law says so; but in order to take effect at all, it must be authorised by the law, and however manifest the intention, that intention is frustrated, if the deed or will evidencing it be not authorised by act of Assembly. There can be no equitable right to freedom; no contract to be enforced in equity, or to be the foundation of an action at law. If there could be an equitable right to freedom, it remains to be proved that this would

not enable him to petition for his freedom. A court of law, trying a petition for freedom, is not in the exercise of common law jurisdiction. Formerly, and for many years, the court itself tried those cases, as it still may; and until the jury trial was authorised, the court, in the trial of such a case, acted precisely as a court of equity; and as if the law, instead of directing the petition to be filed in the common law courts, had selected the court of chancery alone to try them.

I maintain, that courts, whether of law or equity, must derive whatever jurisdiction they possess in regard to slaves from the law; that the master himself cannot give to them any jurisdiction, and cannot give to the slave freedom, otherwise than as the law authorises.

It is said, that in this case the plaintiffs in error have a right to their freedom, but it is an imperfect right, and owing to this imperfection it cannot be asserted at law. Surely the chancery court is not to supply all the defects in the law. If these slaves cannot assert their right in a court of common law, it is because the law does not recognise the right. In the case of *Wicks ag't Chew,* 4 *H. & J.,* 547, the petitioners might well suppose, that they had a right to their freedom, and yet neither in equity nor at law could they be parties to a suit. They are "incapable of suing either in a court of law or equity."

It may be said, that there can be no right without a remedy, *ubi jus, ibi remedium.* This is true, if the maxim be correctly understood, and if applied to this case, might disprove the alleged right. Surely, however, this is not a maxim known only to courts of equity, and now that such courts are not *officinæ brevium,* it would be difficult to prove, that this maxim can give to our courts of equity a power to supply any defect in any law, or remedy, in relation to this case. Notwithstanding this maxim, it is true, that "where cases are new in *principle,* it is necessary to have recourse to legislative interposition, in order to remedy the grievance." *Broome on Legal Maxims,* 92. Courts are not authorised to give a remedy wherever there is an injury; to alter, for example, the law of slander, and to give damages for words now not actionable, because, in their opinion, the person of whom they are uttered,

is injured by the utterance of them, more, perhaps, than if the words uttered had been some of those which are actionable; we must not forget that there is *damnum absque injuria*. In very many cases indeed, "it is a hardship upon the party to be without remedy;" but, by that consideration, courts of justice ought not to be influenced. Hard cases, it has been frequently observed, are apt to introduce bad law. See *Broome, Legal Maxims*, 95, and the authorities there cited. It may be added, that hard as such laws often are when enacted by the legislature, they are very much worse when they owe their existence to judicial legislation. The maxim, *ubi jus, ibi remidium*, is rather a legal than an equitable maxim, and most of the cases in which it has been applied, are cases in which the remedy was applied in courts of law, not chancery cases. *Lex semper dabit remedium*. See *Broome*, 91.

The question here which meets us at once, is, not whether this is a case of hardship and injustice, but whether such a person can be heard in a court of equity of this State? If he cannot, the court is not permitted to judge whether it be a case for which the law ought to provide a remedy? A judge may think it against equity and good conscience to hold any slave, or a particular slave, in bondage; and may have his own notions about the right of a slave to his freedom. This, however, gives him no right to legislate any slave into his freedom, either by a decree declaring him to be free, or by directing him to be emancipated by an individual who may chance to have the *jus disponendi*.

With respect to this class of beings, it is unquestionably true, that they have no civil rights other than those which the law confers upon them, and that the legislature alone can prescribe the remedies to which they must have recourse. If our courts of equity can prescribe new modes, either of granting or obtaining freedom, then the court, having this power is, *quoad hoc*, omnipotent, and it will be found difficult to fix limits to their jurisdiction in such cases. *Ampliare jurisdictionem*, is not now, whatever may have been the case formerly, the business of our courts.

If a negro is entitled to his freedom, the law says, he shall petition for it in the county court of the county wherein the owner resides; and the law which confines him to this one remedy, takes care to secure to each party, in the trial of the case, such privileges as the legislature thinks each ought to have. No where is the chancellor, or the county court, as a court of equity, invested with power to decide any matter between a slave and his owner.

Upon what principle can a court of equity interfere in such a case? It cannot proceed upon its rule, to consider that as done which ought to be done. In 1st *Story's Equity Jurisprudence*, sec. 64, *g*, we have an explanation of this rule, and, among other things, we are told, "that equity will not thus consider things in favor of all persons; but only in favor of such persons as have a right to pray that such things may be done."

If a court of equity can take jurisdiction of this case at all, and deal with it as a case between *cestui que trust* and trustee, it would be bound by the law of the court, to give to the *cestui que trust* all the remedy which that court affords to any person, who can rightfully appear there in that character. It cannot, consistently with its own rules, refuse to him the account which is asked, or afford partial relief, and send him elsewhere for final relief.

The question just spoken of, relative to the claim of a slave to compensation for any portion of his services, was once tried in a different form. In the case of *Queen and Ashton*, 3 *H. & McHenry, p.* 439, an attempt was made in an action for false imprisonment, to recover for the services of the negro, pending an appeal from the judgment of the court below. The grounds upon which that claim was resisted and defeated, may readily be supposed. But upon what principle could it be resisted in chancery, if *there* it is decided to look upon that as done, which the court thinks ought to have been done, and if it be decreed, that in detaining these negroes in bondage, the defendants were guilty of a breach of trust?

It is a settled principle of equity jurisprudence, that "where a particular remedy is given by law, and that remedy bounded

and circumscribed by particular rules, it would be very improper for this court to take it up where the law leaves it, and extend it further than the law allows.''

Now it cannot be doubted, that the act of 1796, ch. 67, provides a remedy for all persons in bondage, who claim to be entitled to their freedom; and it also prescribes the mode of trial. In the latest compilation of our acts of Assembly it is stated, that petitions for freedom, were authorised by the act of 1715, ch. 44, and we learn this also from a former chief justice of this court, in an argument made by him so long ago as the year 1782. See *2nd H. & McHenry*, *p.* 29. No other mode of trial, so far as I have been able to inform myself, ever was authorised.

This, however, it may be said is a remedy, and an ample one, which the law provides to those who already have a right to freedom. The case before us, is the where the negroes have as yet, it is supposed, no right to their freedom, but they are here asking the court to give them a right to freedom, in order that they may assert it elsewhere in the mode prescribed by the act of 1796. Whence does chancery derive any such power? The legislature has given to courts of law all the jurisdiction in the premises which it chooses to confer, and has denied, by not granting, a power to courts of equity. Can equity usurp it?

It may be conceded, that the law is defective; that justice and humanity require a supplement to the act of 1796. All that is insisted upon is, that that supplement ought to be passed by the legislature, and embrace all the cases for which further remedy ought to be provided; that courts of equity have no power to legislate for particular cases of this description, and ought not to be entrusted with any such power.

All that can be said touching these complainants is, that the testatrix authorised certain individuals to execute deeds of manumission to them, when the various provisions of the will would justify it.

If in such a case chancery can interfere, it must be because of its jurisdiction to decree the specific execution of contracts, or the execution of powers.

33    v.4

Now an executor, by accepting of the executorship, may be considered as agreeing or contracting to do this, as well as the other acts, prescribed by the will. It will not answer to say, that here is no valuable consideration, and therefore the agreement cannot be enforced, because, although there may be some such law elsewhere, (see 1*st Bay's Rep'ts*, 260,) yet in *Maryland*, money is not required, or supposed to be the consideration for any deed of manumission executed, or to be executed; and the negroes who were parties to the case of *Wickes vs. Chew and others*, 4 *H. & J.*, 543, if they had been authorised to file a bill for the execution of a contract, could not have been resisted on the ground, that no money was paid or promised.

Even if the court possessed jurisdiction in cases like the present, it would be very difficult to prove, that the case stated in the bill, would authorise the chancellor to interfere with and control the discretion, which the will before us reposes in the executors.

These questions, however, can only arise when the law will permit persons of this description to sue in chancery, and no such law can be found in our statute book. Such persons can appear in a court of law as a plaintiff only for one purpose, because, for such purpose, the law authorises them to appear there. Even there, a person in slavery can appear for no other purpose, simply because, for no other purpose, has the law given him authority to appear there. The law might have authorised such a person, to try his right to freedom, in an action of false imprisonment, and if such had been the law, he could not have claimed his freedom by petition. So the law might have given to the chancery court the jurisdiction which it has conferred on the county courts, and then the courts of law could not have interfered in his behalf, either to try his right, or to help him to recover it elsewhere.

The law, however, has not authorised a person in slavery to sue in chancery for any purpose, and for this one reason that court is not open to him for any purpose, and can be opened to him only by the legislature.

The answer to applications like this to chancery is, that it "will not take jurisdiction, except where it is given by statute,

either by express or by necessary implication, and will not be assumed by analogy or equity of construction.''

In the case of *Fisher's Negroes vs. Dabbs and others*, 6 *Yerger Reports*, 119, it is said, ''no slave can be safely freed, but with the consent of the government where the manumission takes place. It is an act of sovereignty, just as much as naturalizing a foreign subject. To permit an individual to do this at pleasure, would be wholly inadmissible.''

Such, it is believed, has always been the law of *Maryland*, and that the owner of a slave has no more authority, *without the assent of the government*, to declare that a negro, whom the State pronounces to be a slave, shall be henceforth free, than to will that any other article of property shall no longer have an owner. There is power in the State to give freedom to the plaintiffs in error; but such power does not reside in our courts, whether of equity or common law. It is as true here as in *Louisiana*, that ''a negro cannot stand in judgment for any other purpose than to assert his freedom.'' 9 *Louisiana Rep'ts*, 156.

MARTIN, J., delivered the opinion of this court.

The questions presented for our consideration in this case, arise on the following clause of the will of *Mary Van Lear*, which was executed on 26th July 1826, and admitted to probate on the 28th of July 1828.

''It is my will, and I do hereby order and direct my said executors to manumit, by deed, all the slaves which may be mine at the time of my death, whose age and health may be such as that their manumission may not be prohibited by law, leaving it in the discretion of the executors to carry this clause into effect, at such time or times as they may judge proper and expedient.''

It appears that *John Van Lear*, *William Van Lear*, *Matthew S. Van Lear*, and *Joseph Van Lear*, were named by the testatrix as her executors; but that *William*, *Matthew S.*, and *Joseph Van Lear*, having renounced the trust and refused to act as executors, letters testamentary were granted to *John Van Lear*, on the 24th of November 1829.

The thirteenth section of the act of Assembly of 1796, ch. 67, which authorises the owner of slaves to manumit them by his last will and testament, is in these words:

"That from and after the passage of this act, it shall and may be lawful for any person, capable in law to make a valid will and testament, to grant freedom to, and effect the manumission of, any slave, by his, her, or their last will and testament, and such manumission of any slave or slaves, may be made to take effect at the death of the testator or testators, or at such other periods as may be limited in such last will and testament, provided, always, that no manumission, hereafter to be made by last will and testament, shall be effectual to give freedom to any slave or slaves, if the same shall be in prejudice of creditors, nor unless the said slave or slaves shall be under the age of forty-five years, and able to work and gain a sufficient maintenance and livelihood at the time the freedom shall commence."

The executor having refused to execute the power conferred upon him by the will of *Mrs. Van Lear*, after the expiration of fourteen years, the appellants filed their original bill, on the 13th of May 1842; in which, after stating that the executors had refused to execute to them deeds of manumission, although they were not prohibited by law from being manumitted in consequence of their age or health, and that they were retained in the servitude of the executors for their own profit and emolument, pray, among other things, that the executor or executors may be required by the court to execute to the complainants deeds of manumission. An amended bill was filed by the complainants on the 13th of December 1843, in which they charge, that a sufficient personal estate was left by the testatrix to pay her debts without including the complainants, and that at the date of the bill there were no outstanding debts against the estate unsatisfied.

It is clear, that the facts disclosed by these bills, and the truth of which is conceded by the demurrer, present a proper case for the interposition of a court of equity, on the general principles by which that tribunal is governed, in reference of the execution of trusts and powers.

In the case of *Mislington against Mulgrave*, 4 *Mad'x Rep.*, 254, it was held, that trustees to whom a discretionary power was given of renewing leases, had not an arbitrary power of renewal, but must renew when most for the benefit of the *cestui que trusts*.

The vice chancellor said : "I cannot allow these demurrers, without holding that the trustees have an arbitrary and capricious power with respect to the renewal of this lease, and are not to be required to give any explanation why the lease has not hitherto been renewed. Such an arbitrary and capricious power may be given to trustees, but it is not conferred by this settlement, where the trustees are to renew as occasion may require, and as they may think proper; by which it is to be understood, as they may think proper for the interests of their *cestui que trusts*." The same doctrine is announced in *Palmer against Wheeler*, 2 *B. & Beat*, 18, where the lord chancellor states the established principle, that a trustee is not allowed to abuse a discretionary power with which he is invested for the benefit of others, and which he is bound to exercise, according to the just claims of the *cestui que trusts*, by converting it into a source of emolument for himself. Such acts are regarded by a court of equity, and redressed, as a fraud upon the power created by the will.

The counsel for the appellees has, however, contended, that the bills do not present a case in which the complainants are entitled to the interposition of a court of equity, because the subject matter of the bills is not within the jurisdiction of that tribunal; and also upon the ground, that the complainants being in a condition of slavery, were disabled by the laws of the State from suing in any other mode than by a petition in a court of law.

It is certainly true, that by the statute law of *Maryland* upon the subject of slavery, a claim to freedom can only be established by the judgment of a court of law, and the petition must originate in the county where the petitioner resides, under the direction of his owner. Act of Assembly of 1796, ch. 67, section 21. And if the only question raised by the demurrer was, whether a court of chancery is authorised to adjudicate

upon a claim of freedom, we should declare, that the objections stated by the demurrer were unanswerable, and that the decree of the court below must be sustained.   But, although the bills of complaint pray, that the complainants may be decreed to be free, and that as consequent upon such relief, they might be allowed adequate compensation for their services, for the time they were detained in slavery by the defendants; yet the bills also specifically pray, that the executors may be compelled to carry into effect the power granted by the will, and execute deeds of manumission to the complainants.   In this aspect of the case, we think, the relief asked for by the bills, was a proper subject for the action of a court of equity,—not to pronounce, by its decree, the freedom of the complainants, but to direct the executor to execute deeds of manumission, and thus enable them to assert their claim to freedom in the appropriate tribunal, a court of law.

The counsel for the appellee has also disputed the competency of a court of equity to afford the relief sought for by these bills, on the ground, that by the laws of *Maryland*, slaves have no civil rights, except, that for the purpose of testing their right to freedom, a remedy is given to them by the act of Assembly, in the form of a petition, in a court of law.

It is established, that by the laws of this State, a slave possesses no civil rights, and as a general proposition, it is true, that he is incapable of instituting a suit either in a court of law or equity.   But as he has been made capable of acquiring freedom, by deed or will, the statutes of *Maryland* recognise his ability to assert in a court of law his right to freedom, notwithstanding, pending the controversy, and before the question of freedom is adjudicated, he is treated as a slave.   Act of Assembly 1796, ch. 67, sec. 21.

In the case of *Queen against Neale*, 3 *H. & J.*, 158, in *Charles* county court, the petitioner exhibited her affidavit, stating that she believed she could not have a fair and impartial trial in that court, and moved the court that the record should be removed to another county, as authorised by the act of Assembly of 1804, ch. 55.   The motion was overruled.   And the judgment was affirmed by the Court of Appeals, upon the

ground, "that a negro petitioning for freedom, is not competent to make such affidavit, his slavery or freedom being then *sub judice*, and if a slave, he was excluded by the act of 1717, ch. 13."

In *Fenwick against Chapman*, 9 *Pet.*, 475, the Supreme Court say: "If an executor withholds freedom from manumitted slaves, the slaves may prefer their petition at law against the executor, or against any person holding them under him, and may recover their freedom by a judgment at law. And the slaves may do this upon the principle, that a statute never gives a right without providing a remedy; in the absence of such provision, contemplating that there is a legal remedy to secure it."

As in this case, the complainants were under the necessity of invoking the aid of a court of equity, that an execution of the power created by the will might be enforced, as preliminary to the institution of a petition for freedom in a court of law; we think, that in analogy to the right secured to the slave of preferring his petition in that court for the purpose of establishing his freedom, and on the principle so distinctly announced by the Supreme Court, in the case of *Fenwick and Chapman*, they must be regarded as *capacitated* for the purposes of this suit, and therefore able to maintain it.

The objection taken to these bills, on the ground that the complainants have been improperly joined, cannot be sustained. The late *Judge Story*, in his treatise on equity pleadings, section 285, says :

"Another exception to the general doctrine respecting multifariousness and misjoinder, which has already been alluded to, is, where the parties, either plaintiffs or defendants, have one common interest touching the matter of the bill, although they claim under distinct titles, and have independent interests. The cases respecting rights of common, where all the commoners may join, or one may sue or be sued for all; of parishioners to establish a general *modus;* and others of a like nature, fully exemplify the doctrine; for in all of them there is a common interest centreing in the point in issue in the cause."

The same principle, the learned commentator remarks, has been supposed properly to justify the joining of several judgment creditors in one bill, against their common debtor and his grantees, to remove impediments to their remedy, created by the fraud of their debtor, in conveying his property to several grantees. In such case the fraud equally affects all the plaintiffs, and they may jointly sue.

In the case of *Ward against Northumberland*, 2 *Anst.*, 469, the *Lord Chief Baron* says: "The cases cited of unconnected parties being joined in a suit, are, where there is one common interest among them all, centreing in the point in issue in the cause."

The authorities to which we have referred, furnish us with the true rule upon this question of pleading, and we think, that there was no misjoinder of complainants. For although the interests of the plaintiffs were independent, as it respects the freedom of each, yet each one had a common interest in arresting a perversion of the trust by the executor, and obtaining from him deeds of manumission in conformity with the intention of the testatrix.

We think, however, that two of the defendants, *William* and *Joseph Van Lear*, were improperly joined, and that the bills as to them should have been dismissed. They had renounced the executorship, and any interest which they may have had in the object of the suit, was represented by *John Van Lear*, as the executor and personal representative of the testatrix. *Story Eq. P.*, secs. 140, 141. And in a case of this kind, it was only necessary to proceed against the party whose duty it was to execute deeds of manumission in pursuance of the power created by the will.

It follows from the views thus expressed, that we think the court below had no power to determine by their decree the freedom of the complainants, nor to order an account of the value of their services, as prayed for in the bills; but that, on the case presented by these bills, the court had jurisdiction of the cause, for the purpose of directing the executor to execute deeds of manumission as required by the will. And that *William* and *Joseph Van Lear* were not proper parties to this proceeding, and that the bills, as to them, should be dismissed.

As we think, however, that the substantial merits of the cause will not be determined by the reversing or affirming the decree passed in this case, it is remanded to the county court of *Washington* county, sitting as a court of equity, that such further proceedings may be had as may be necessary to determine the cause upon its merits, in conformity with the act of Assembly of 1832, ch. 302, sec. 6.

CAUSE REMANDED UNDER ACT OF

1832, CH. 302, SEC. 6.