(Decided March 27th, 1861.)

---

# NEGROES CHASE, *et al., vs.* MORDECAI PLUMMER.

A testator gave and devised all his estate, real and personal, to his sister, and the heirs of her body, lawfully begotten, and in case she died *"without such issue,"* then all his said estate, *except his slaves*, over, and then

added: "it is my *wish* and *desire,* in case my said sister die without is-
sue, that she *shall will and devise all my negroes to be free,* or manumit
them in any other way she may think proper; this *request* I *hope* she will
comply with in time, so as to carry my *wish* into effect." The sister
married, survived her husband, and died *intestate,* never having had is-
sue, and without manumitting these negroes. HELD:

1st. That the sister took an *absolute estate* in the negroes bequeathed to her
by this will, unless the language in reference to their manumission can
be construed as limiting that interest.

2nd. That looking to the entire instrument, the property, the nature of the
supposed trust, and the requirements of our laws in reference to manu-
mission, this will does *not* create *a trust,* by implication, in favor of the
negroes, which a court of equity may execute, by compelling the party
holding them to make deeds of manumission to them.

It has been frequently decided, both in England and in this country, that
words of recommendation, desire, hope, and such like, will raise a trust
to be executed by the person to whom they are addressed.

But such expressions are not always *imperative;* they are flexible in char-
acter, and whether they are to prevail in a particular case, is always a
question of construction upon the whole will.

Such expressions must yield, if against the rules of law, or so inconsistent
with other provisions of the will that both cannot stand together, or if
it appears from the whole will, and the nature of the property, that the
testator meant to depend on the justice or gratitude of the donee, or
reposed in him a power to execute the supposed trust or not, at his
discretion.

APPEAL from the Equity Side of the Circuit Court for
Prince George's county.

The bill in this case was filed on the 9th of June 1854, by
the appellants, sundry negroes, claiming to be free, against
the appellee, averring that Jacob W. Brashears died in 1816,
leaving a last will and testament, executed on the 2nd of Oc-
tober 1811, by which he appointed one William Wells his
executor, and disposed of his property as follows:

"I give and devise unto my beloved sister, Mimy Brashears,
and the heirs of her body, lawfully begotten, all my estate,
both real and personal, of every kind and description whatso-
ever, and in case she shall die without such issue, I give and
devise my whole estate, both real and personal, *(except my
slaves,)* to my nephew, Richard B. Brashears, and the heirs
of his body, lawfully begotten; and if he should die without

issue, then to my nearest relations, in fee-simple, to be equally divided among them. *It is my wish and desire, in case my sister Mimy die without issue, that she shall will and devise all my negroes to be free, or manumit them in any other way she may think proper; this request I hope she will comply with in time, so as to carry my wish into effect.*"

The bill then charges that letters testamentary were granted to the executor named in said will, and that shortly after the death of the testator, Mimy, or Jemima Brashears, married William Wells, of George, and shortly afterwards Richard B. Brashears died, intestate and without issue; that the said Jemima took possession of all said negroes, of whom the complainants were part, and continued to hold them to the time of her death, in 1854, when she died, intestate, without issue, and never having had a child, and without having devised the said negroes, or any of them, to be free, or manumitted them in any way, as she was required to do by said will. The bill further charges that said negroes were bequeathed to the said Jemima for life only, upon the express trust and special confidence, and with the design that she should, in some legal manner, execute a manumission of the said slaves, in case she should leave no heirs, of her body lawfully begotten, and that her neglect to do so, was a violation of the express condition so imposed upon her by said will, and a fraud upon the rights of the complainants.

The bill further charges that said William Wells, of George, died in 1853, before his said wife, leaving a will, of which he appointed the defendant the executor, who, pretending that the complainants were the slaves of his testator, has possessed himself of them, and exercises authority and control over them; that no administration was taken out upon the estate of said Jemima Wells; that the executor of said Jacob W. Brashears has been dead for many years, and that said Jacob left a personal estate, exclusive of negroes, fully sufficient to pay all his debts; that the defendant holds the complainants as slaves, and denies that they are entitled to their freedom; and that they are not prohibited by law from being manumitted, by reason of their age, or health, or any other cause.

The bill then prays that a decree may pass, authorizing and requiring the defendant, or some other proper person, to be thereto appointed, to execute deeds of manumission to the complainants, to take effect from the death of the said Jemima Wells, to enable them to file their petitions for freedom in the circuit court for Prince George's county.

The defendant, in his *answer*, admits the execution of the will of Jacob W. Brashears, and his death, as stated in the bill, that after his death all his estate, including negroes, came to the possession of his sister, the said Jemima, and he admits the intermarriage and death of said Jemima, and the death of Richard B. Brashears, as charged in the bill. He charges that, by virtue of said marriage, the said real and personal estate passed into the possession of, and under the control, ownership and management of the said William Wells, of George, in whose possession it remained till his death, in 1852. He denies that the complainants ever belonged to Jacob W. Brashears, and insists upon full proof of their allegation in this respect. He avers that five of the complainants were born of slaves, the property of said Jemima, in her own right, after the death of said Jacob, and during her coverture with said William, and that the four other complainants, if they ever did belong to said Jacob, which he denies, were each of them largely over the age of forty-five at the death of the said Jemima, and were incapable of gaining a livelihood, and by reason thereof, incapable of receiving manumission, and that neither the said Jemima or the said Wm. Wells, of Geo., were, in their lifetime, under any obligation, moral, equitable or legal, to manumit the said slaves, or any of them. The answer further alleges, that by the legal effect of the will of said Jacob, the absolute estate, in fee-simple, of the real estate, and the unqualified and unconditional title to all the personal estate, including the negroes, vested in the said Jemima, and that the limitation over of their freedom depended, upon her dying without heirs of her body lawfully begotten, was too remote, and therefore void, and that they passed, as slaves for life, to her said husband, by whose last will and testament they were bequeathed

and left to the respondent, and he now claims them as slaves for life.

A replication was filed and testimony taken, which, however, need not be stated, inasmuch as the decision of this court is based entirely upon the construction of the will. The court below (CRAIN, J.) passed a decree dismissing the bill with costs, from which the complainants appealed. Accompanying that decree the judge delivered an opinion, in which, after stating the allegations of the bill and answer, and facts of the case, he says:

"'The first clause of this bequest, in the will of Jacob W. Brashears, according to the English law, gives an estate in fee-tail, general in the real estate, to Mimy Brashears, which, by operation of the Act of 1786, ch. 45, was converted into an estate in fee-simple, and also gives an absolute estate in the personal property. It is not necessary to refer to English authorities to show that a limitation over of real or personal estate, after an indefinite failure of issue, is void, because our Court of Appeals, in the cases in *4 H. & J.*, 441, *7 H. & J.*, 240, and *1 H. & G.*, 111, say that a limitation over, after an indefinite failure of issue, is void, both as to real and personal estate. There must be some words or language in the will to restrict it to a dying without issue living at the time of the death of the first taker. This language was uniformly held by our Court of Appeals until the case of *Biscoe vs. Biscoe*, *6 G. & J.*, 232, when the court made a modification in this rule. Previous to that case, the judges had looked to the words and language of the will for the rule of interpretation, and if no words could be found in the will to limit and restrict the words 'dying without issue,' the limitation over was adjudged to be void, but in the case of *Biscoe vs. Biscoe*, the court decided to look to the subject-matter of bequest, and as the subject of the bequest was a negro man, they drew a distinction, and held the limitation over to be good, upon the ground that the contingency must happen within the life of the negro man. In that case they distinguished between a negro woman and a negro man, when they were the subjects of the bequest, deciding that an executory devise of a negro

man was good, whilst that of a negro woman and her increase would be void. A few years after, the case of *Hatton vs. Weems*, 12 *G. & J.*, 83, was decided by the court, and as that limitation over included negro women as well as negro men, they decided the limitation over was void. Judge Archer said there could not be two intentions in the same clause of the will, and as the testator did not intend the limitation over of the women to be good, the same intention must be applicable to the men. Now, in this case, Jacob W. Brashears includes all his negroes, both male and female, and the limitation over is void, unless he granted them freedom by the second clause in the will, where he says: 'It is my wish and desire, in case my sister Mimy die without issue, she shall will and devise all my negroes to be free, or manumit them in any other way she may think proper.'

"If this language is sufficient to give them a grant of freedom, then the limitation over is not void, according to the decision of the Court of Appeals, in 6 *Md. Rep.*, 151. The court, in that case, again modified the rule, and said, as freedom was a personal privilege, to be enjoyed during the lifetime of the negroes, the limitation over of freedom to male and female negroes was good; so that if Jacob W. Brashears had said: 'If my sister Mimy shall die without issue, then I manumit my slaves,' the limitation over of freedom would have been good. But as there is no grant of freedom to the slaves by this clause of the will, Mimy Brashears took an absolute estate in the negroes, all of whom she could manumit if she thought proper, or make any other disposition of them. As it is an absolute gift of the property to Mimy Brashears, the wish annexed to it cannot be considered binding, and must be held null and void. A party has no right to give slaves to another and request him to manumit them, and thereby subject him to the obligations of the Act of 1831, ch. 281. If the testator wishes them to enjoy freedom, he should have manumitted them himself. This case is not like the case of *Peters vs. Van Lear*, 4 *Gill*, 249. In that case there was a grant of freedom, and a power conferred on the executors to manumit, but in this case no one, after the death of

Mimy Brashears, has power to manumit, because there was no grant of freedom.

"No court could have limited, by its decree, the absolute estate of Mimy Brashears in the property, or, by its decree, compelled her to manumit the slaves. As no decree could have forced her to manumit them, what power or authority have we to compel the defendant, a stranger, to manumit the slaves?

"But admitting the power and authority of the court to compel the defendant to execute deeds of manumission to the surviving slaves of Jacob W. Brashears, could it be done under the existing laws of this State? From the evidence before the court, all of the negroes living at the time of Jacob W. Brashears' death, are now over forty-five years of age, and as they claim in virtue of a will executed in 1811, and probated in 1816, the restrictions in the Act of 1796, ch. 67, were in existence and applied. The 13th sec. of that Act provides that no slave or slaves shall hereafter be manumitted unless they be under the age of forty-five years, and be able to work and gain a sufficient maintenance and livelihood *at the time the freedom given shall commence.* This limitation on manumission was to protect helpless childhood and decrepid old age; it was a wise and salutary restriction, dictated alike by humanity and public policy.

"If this restriction on manumission still operates against these negroes, we cannot manumit them. But it is contended that these restrictions were repealed by the Act of 1831, ch. 281, and that all slaves are now entitled to take their freedom, notwithstanding their age or inability to support themselves. It is true, the Court of Appeals have felt themselves bound to give this construction to that Act. See 7 *Md. Rep.*, 453. But that law applies to all subsequent manumissions, and devolves a liability on the manumittor to maintain the slave, in the event of his inability to support himself. After authorizing permits to be granted to manumitted slaves, the 5th section of the Act says:—'That such permits shall not exempt any manumittor, or his representatives, or his estate from any liability to maintain any hereafter emancipated slave who,

at the time his or her right to freedom accrues, may be unable to gain a livelihood, or be above forty-five years of age at the said time, and afterwards become unable to maintain himself or herself.' After the passage of that Act, the manumittor liberated his slaves subject to the legal responsibilities devolved upon him in the event that the manumitted slaves became a burden on the public:—the words are, *'hereafter emancipated.'*

"The complainants claim their freedom by virtue of the will of Jacob W. Brashears, executed in 1811. If the restrictions in the Act of 1796, are repealed by the Act of 1831, so far as these negroes are concerned, can this court have the power and authority to make the defendant manumit these slaves, subject to the obligations of the 5th section of the Act of 1831, ch. 281? I do not think I can devolve upon him such obligations and responsibilities, and shall, therefore, dismiss the bill."

The cause was argued before LE GRAND, C. J., TUCK and GOLDSBOROUGH, J.

*A. B. Hagner,* for the appellants:

The main question in this case is, are these negroes entitled, under the will of Jacob W. Brashears, to the relief asked in their bill? The clauses of the will, if other matters be excluded, will read thus:—"I give and devise *my slaves* to my sister Mimy Brashears, and the heirs of her body lawfully begotten. It is my *wish* and *desire,* in case she die *without issue,* that she *shall will* and devise all my negroes to be free, or manumit them in any other way she may think proper; this *request* I *hope* she will comply with *in time,* so as to carry my *wish* into effect." Now it is clear, that this limitation over of freedom to the negroes upon the death of the legatee *without issue,* is not void under the law by reason of remoteness. 6 *Md. Rep.,* 151, *Woodland & Wife vs. Wallis.* 6 *G. & J.,* 232, *Biscoe vs. Biscoe.* 2 *Spence's Eq.,* 66. 2 *Brown's Ch. Rep.,* 46, *Pierson vs. Garnet.* This being so, it is insisted, that the words of *request* in this will,

that his sister would manumit the negroes he left her, will be construed as *creating a trust* in their favor. Words precatory, or recommendatory, or expressing a belief as if he *"desire," "will," "request," "will and desire," "wish* and *request," "hope," "recommend,"* "entreat," "most heartily beseech," order and direct," "authorise and empower," "do not doubt," "be well assured," "have the fullest confidence," "of course the legatee will give," "in consideration the legatee has promised to give;" all these expressions have been decided as manifesting an intention of creating a trust, (*Lewin on Trusts*, 77, in 24 *Law Lib.*,) which equity will execute whether there be an *actual trustee* or not, in favor of the *cestui que trusts*, if, by any possibility, it can be executed by the court, and it makes no difference that the trustee has neglected to execute it. 1 *Spence's Eq.*, 498, 501. 2 *Spence's Eq.*, 51. See, also, 1 *Jarman on Wills*, 334, 345, 348. 2 *Story's Eq.*, sec., 1068. The same doctrine is also well established by the decisions of this court. 10 *G. & J.*, 159, *Tolson vs. Tolson*. 13 *Md. Rep.*, 466, *Willet & Wife vs. Carroll*. And in the cases of *Peters vs. Van Lear*, 4 *Gill*, 249, and *Pearce vs. Van Lear*, 5 *Md. Rep.*, 85, where a testatrix by her will, probated in 1828, directed her executors "to manumit by deed," all her slaves, leaving it to their "discretion," to do so when they shall judge expedient and proper, it was held that a court of equity had power to execute this trust by decreeing deeds of manumission to be executed, and that such deeds when executed in 1851, conferred freedom *by relation from the death of the testatrix.* The words used in the present will, as creating a trust, are stronger than many, and as strong as any that can be found in the decisions upon this subject; and there is no uncertainty as to the *persons designed* to take, or as to the *thing given.* In the case of *Pierson vs. Garnet*, 2 *Brown's Ch. Rep.*, 38, personal estate was given to a legatee in fee, and then the testator added: "it is my dying request to the said legatee, *that if he shall die without issue living at his death*, that he do dispose of what fortune he shall receive under this my will, to and among the descendants of my late aunt,

*Anne Coppinger*, his grandmother, in such manner and pro-
portion as he shall think proper,'' and it was held that these
words were *imperative, and created a trust* in favor of the
descendants of Anne Coppinger, and that it made no differ-
ence that the estate, in the first instance, was given *in fee*.
For other, and recent American cases to the same effect, see
2 *Grattan*, 1, *Harrison vs. Harrison.* 11 *Grattan*, 454,
*Steele vs. Levisay.* 2 *Yerger*, 126, *Hope vs. Johnson.* 3
*Humph.*, 569, *Hinklin vs. Hamilton.* 1 *Meigs*, 114, *Jacob
vs. Sharp.* 1 *Leigh*, 465, *Dunn vs. Amey, et al.* 4 *Leigh*,
163, *Paup vs. Mingo, et al.* 2 *Call*, 319, *Pleasants vs.
Pleasants.* 8 *Pet.*, 220, *McCutchen vs. Marshall.* 5
*Humph.*, 368. It is, therefore, submitted, that these negroes
were manumitted by this will; that the *precatory* words there-
in contained make it a manumission; that it makes no differ-
ence that the legatee, upon whom this trust was imposed,
neglected to execute the same; and that a court of equity
will direct the defendant or some other person to execute the
deeds of manumission required by this will, in order to allow
the negroes to prosecute their petition for freedom, and that
the deeds, when so executed, will relate back to the time of
the death of the legatee, Jemima Brashears. But again, the
bequest to Jemima Brashears of the negroes for her life, was
made by the testator upon the trust and confidence that she
would manumit them, in the event of her having no issue at
the time of her death. She *elected* to take under this will
and must be bound by its provisions, and her neglect to carry
out its provisions in reference to this manumission was a fraud
upon her part, if done designedly, and will be redressed by a
court of equity. 2 *Gill*, 181, *McElfresh vs. Schley.*

*Thos. F. Bowie* and *C. C. Magruder*, for the appellee:
This will, it is submitted, vested a *fee-simple estate*, and
not an estate for life, in the land and negroes, in Jemima
Brashears, and the limitation over, dependent on her dying
without issue, means an indefinite failue of issue, and is void,
because too remote. 12 *G. & J.*, 84, *Hatton vs. Weems.*
But, in any event, it is insisted, that these negroes are not

entitled to the relief now asked for by them. · It is admitted, that *precatory* or *recommendatory* words will create a trust. But such words, though "they may be imperative are not necessarily so; the subject matter, the situation of the parties, and the probable intent, must be considered; it is not every wish or expectation which a testator may express, nor every act which he may wish his successors to do, that can or ought to be executed as a trust in this court. Each case must be considered upon the whole context and circumstances of the will, and the circumstances under which the testator stood as connected with the words used in his will, the consequences also, or which might be deduced from interpreting the words as importing a trust to the extent insisted upon, particularly as affecting the positive devises in the will, clearly importing beneficial enjoyment, may or rather must be looked to in order to ascertain what was the intention, whatever may be the weight attached to the words of recommendation standing by themselves," 2 *Spence's Eq.*, 67. Again, "if the recommendation is so worded that it necessarily implies a discretion, which must be governed by the exercise of the donee's own individual judgment, it will not be treated as a trust." 2 *Spence's Eq.*, 68. See, also, cases cited and commented on in 1 *Jarman on Wills, ch.* 13, *sec.* 5. This case is clearly distinguishable from those of *Peters vs. Van Lear*, and *Pearce vs. Van Lear*, cited on the other side. There the will *itself directed* the executors to manumit, whilst in this case the will does no such thing, but simply requests *the legatee* to do so. In the former case it was a mode of manumission *known to the laws* of this State. It was a manumission by will. But there is no *bequest of freedom* by the terms of this will. The testator did not intend to give freedom to his negroes if his sister should marry and have issue, and only requests her to make the manumission in case she died without issue. Taking, therefore, the whole will together, and looking to the subject of the bequest, the condition of the legatee, the terms in which the request is made, and the policy of our laws on the subject of manumission, it

is submitted the relief asked for by these parties cannot be granted.

*Note*:—The argument upon other points, on both sides, is omitted.

TUCK, J., delivered the opinion of this court.

We agree with the judge below, that Mrs. Wells took an absolute estate in the negroes bequeathed by the will of her brother, Jacob W. Brashears, unless the language in reference to their manumission can be construed as limiting that interest. The cases cited in his opinion establish this beyond any doubt.

Whether the will created a trust by implication in favor of the negroes, which may be executed by compelling the appellee, or any person who might happen to have them in possession, to make deeds of manumission to them, is the main question in the cause, and although there are others which, in the view of the appellee's counsel, entitle him to an affirmance of the decree, we think the construction of the will should not be overlooked, as well on the appellee's account, who might be subjected to the imputation of holding in servitude persons entitled to freedom; as because the negroes themselves should understand that their claim has been solemnly considered and disallowed by the highest tribunal in the State.

It has been frequently decided in England and in this country, that words of recommendation, desire, hope, and such like, will raise a trust to be executed by the person to whom they may be addressed. The cases on this branch of jurisprudence were brought before the Court of Appeals in *Tolson vs. Tolson*, 10 *G. & J.*, 159, where the doctrine was first recognized in Maryland. But such expressions are not always imperative; they are deemed to be flexible in character, and must yield, if the imputed interpretation be against the rules of law, or so inconsistent with other provisions in the will that both cannot stand together, or if it appear from the whole will and the nature of the property, that the testator meant to depend on the justice and gratitude of the donee,

or reposed in him a power to execute the supposed trust or not, at his discretion. In some cases where the strongest terms were employed, relief has been denied. So that, while we find the doctrine well established, when courts come to apply it, the question, whether it is to be recognized in the particular case, is always one of construction, depending upon the whole will.

In the will before us, the language is as plain as in any of the cases to be found in the books—on this point there is no difficulty—yet, looking to the entire instrument, the property, the nature of the supposed trust, and the requirements of our laws in reference to manumission, we have come to the conclusion that such relief cannot be granted. The modes provided by law for liberating slaves, we must presume, were known to the testator, and no reason is suggested by the will why he left to his sister the execution of a purpose, supposing he intended the negroes to be free, which he did not accomplish himself. For causes satisfactory to him, and perhaps known to her, he did not provide for their freedom by direct bequest, but confided to his legatee a large discretion, both as to the time and manner of making the manumission. It is manifest that he did not intend their freedom to take effect, at all events, on the death of his sister. She might have left issue, and in that contingency the supposed trust would have failed, and as her dying without issue was the event contemplated by the will, the trust could not have been enforced in her lifetime without impairing her enjoyment of the bequest to herself; nor could she have been compelled to execute a deed or will, because she was left at large as to the mode of manumission, and no court would have interfered with the exercise of her own judgment and discretion as to the time and mode of doing what the testator had requested. Again, the will looked to the sister's marriage, and issue of the marriage. The testator knew that if she married, she could neither make a deed or will during coverture, and we must suppose that he made this request with the understanding that, as far as the legatee's agency was necessary to the grati-

fication of his purpose, her marriage would defeat it, unless she happened to survive her husband; and, on that theory of the case, the execution of the trust might depend on other contingencies than those mentioned in the will, and, in addition to this, by the marriage, the rights of the sister would devolve on her husband, and in that way increase the uncertainties attending the execution of the trust, if any was intended. This event did happen, the husband received the negroes from the executor, and disposed of them by will, as is alleged, which, perhaps, prevented Mrs. Wells from complying with her brother's wishes, as expressed in his will.

There are two modes of manumission known to the laws of Maryland, and it has never been held that freedom can be obtained under a trust of this kind. In Mrs. Van Lear's will, (4 *Gill,* 249,) the direction was positive to the executors, whose duty it was to execute the deeds, and the court held that the negroes were free under the will by relation, and that the executors were clothed with a power merely, over which they had no discretion, if they accepted the office of executor. Here the party addressed was not executor, but a legatee, with a discretion, as we think, to manumit or not. He did not manumit them or intend they should be free under his will, but, if at all, by some act of his legatee, provided she thought proper to discharge them.

We do not think the doctrine of election applies. When it is said that the testator bequeathed the negroes under the trust and confidence that his legatee would set them free if she died without issue, the argument assumes what the appellee denies, and which, indeed, is the question at issue—did she take them under such an imperative trust and confidence? We think she did not, in the sense in which these words are used in equity; but she had a full title under the will.

We are dealing with the rights of parties under the law, not with the moral duties of Mrs. Wells, or of any claiming under her and her husband. If, as is alleged, the appellee has these negroes in possession, claiming them as owner under Mr. and Mrs. Wells, he must determine for himself

whether he will manumit them or not.   This court possesses no power to direct it.

Being of opinion that the complainants had no right to relief, the decree must be affirmed, but without costs in either court.

*Decree affirmed.*

(Decided April 1st, 1861.)