## THOMAS C. BASSHOR COMPANY ET AL *v.* EDWARD C. CARRINGTON, JR., RECEIVER, ET AL.

*Special Fund Payable by Building Committee to a Contractor Impressed with a Trust—Liability of Building Committee for Breach of Trust —Liability of Parties Receiving Trust Fund—Improper Advance to Contractor—Suit in Equity by Trustee for Bondholders and Receiver of Corporation—Joinder of Parties.*

When a fund is deposited in a bank in the name of a contractor to be used by him in the erection of a building for a corporation, but not to be drawn out except upon certificates of the building committee of the corporation as installments of the work shall have been done by the contractor, such fund is impressed with a trust. And if the building committee, knowing that the contractor has not done the work, or

negligently without inquiry, give him certificates upon which he draws out such fund and applies the same to his own purposes, that action constitutes a breach of trust, and the members of the committee, being *quasi* trustees, are liable for the amount of the fund so diverted, as are also the persons to whom the fund is paid, who have knowledge of the breach of trust.

The building committee of a corporation, charged with the duty both to the corporation and to the bond holders of seeing that the money derived from a sale of the bonds is applied to a designated purpose, are accountable in equity for mismanagement of the fund or neglect of duty, in the same way as are officers or directors of a corporation.

When a building committee is authorized to make payments to a contractor from time to time as the work contracted for progresses, they have no authority to advance money to the contractor for his private purposes before any work has been done.

An ice company, being about to erect an additional manufacturing plant executed a mortgage of the property to a trust company to secure an issue of bonds, and convenanted that the proceeds should be used exclusively for building and equipping the plant. The ice company appointed a building committee to supervise the work, and this committee made an agreement for the company with a contractor for erecting the plant, and a bank by which a loan was obtained on the bonds, placed to the credit of the contracter in a special account, to be drawn out upon checks executed by him accompanied by certificates or orders of the building committee, who were empowered to give the same in installments from time to time as the work on the plant progressed. Before any property was acquired by the contractor, or work done, he drew out a large part of this fund upon certificates of the building committee and applied the same to his own private purposes. The members of the committee either knew that the contractor's checks were not given for any of the purposes to which the fund was devoted, or negligently delivered their certificates. Default was made in payment of interest on the bonds, the ice company became insolvent, the property was sold and the proceeds were insufficient to pay the bonds. The bill in this case, alleging the above facts, was filed by the receiver of the ice company and the trust company, mortgagee, against the members of the building committee, the contractor, and the persons to whom he paid the money so drawn out of the special account, claiming that the defendants were liable for the same. *Held*, that a demurrer to the bill was properly overruled, since it sets forth a case in which a fund impressed with a trust had been diverted, and the defendants who knowingly participated in such breach of trust, are liable to make good the loss so occasioned.

*Held*, further, that the trust company, as the representative of the ¦bond holders, is interested in the recovery of the money which has been di- verted from the trust and which should be applied towards the pay-

ment of the bonds, and is consequently a proper party plaintiff, although there was no privity of contract between the Trust company and the defendants; that the receiver of the ice company is also entitled to unite in the suit, because that company was one of the parties for whose benefit the special trust was created, and it is the duty of the receiver to aid in the recovery of any funds belonging to the company, although when received they may be applied to the payment of the bonds, for such payment will to that extent reduce the indebtedness of the company.

*Held*, further that the joinder of the trust company and the receiver in the same suit is proper since their interests are not conflicting.

*Decided December 21st, 1906.*

Appeal from the Circuit Court No. 2, of Baltimore City (STOCKBRIDGE, J.)

The cause was argued before McSHERRY, C. J., BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Vernon Cook* (with whom were *Gans & Haman* and *Chas. W. Field* on the brief), for the appellants.

1. The members of the building committee were mere agents of the corporation charged with the duty of safeguarding the money raised from the bonds. The claim against them is based on the allegations contained in the eleventh paragraph that they "either knew that said check was not given for any of the purposes to which said fund was devoted or made no inquiry, and *recklessly* and *negligently* executed and delivered the said certificate." That is to say, that they were liable to the plaintiff either as guilty parties to a wrongful conversion of the plaintiffs' money, or for negligence in allowing Hammond to wrongfully convert the same to his own use.

In either case there is a full and adequate remedy at law. In the former case an action on the common counts for money had and received, and in the latter an action on the case for negligence. These are the ordinary remedies of a principal against an unfaithful agent. *Ency. of Pl. and Pr.*, vol. 16, pp. 911–2.

Where no accounting is needed and no special circumstances

for equitable intervention exist the remedy at law is the only remedy of a corporation against its unfaithful or negligent agents. *Clark & Marshall on Corporations*, sec. 755A; *Thompson on Corporations*, vol. 3, sec. 4120; *Cook on Corporations*, sec. 701, pp. 1685–6.

It will be argued, however, for the appellees that special circumstances do exist in this case which give equity jurisdiction, and that these circumstances are:

(*a*) That the defendants were directors in the Hammond Ice Company, thus bringing the case within the Maryland rule that equity has jurisdiction in a suit by a corporation against its directors for negligence, and

(*b*) That this proceeding is one to recover a trust fund and to hold liable those who by willful or negligent acts aided in its loss.

(*a*) The bill does not allege that the defendants were directors though there is a list of the directors contained in one of the exhibits which list includes the names of the defendants. Even if this be taken as a sufficient allegation that the defendants held that relation to the corporation, we think it must be admitted that they were acting, as to this particular matter, in their special capacity as members of a building committee and not in their general capacity as directors.

Directors have been held liable in equity because they are at least *quasi* trustees. To them is entrusted practically almost the entire management of the corporate affairs, they stand in a position which requires of them the highest degree of good faith. Their relation to the corporation is a confidential relation of the very closest character. It is by reason of this close and confidential relation, this *quasi* trusteeship, that equity has sometimes assumed jurisdiction over litigation by the corporation against its *quasi* trustees.

This doctrine, however, has, so far as we can find from the authorities, never been extended to the case of other subordinate agents of a corporation, no matter how important their functions may be. Neither does it seem to us possible to find any true analogy between the case of directors, who control

practically every corporate act, and that of other agents to whom only limited powers and duties have been assigned.

Again, even in the case of directors we contend that this Court has not gone further than to decide that the jurisdiction in equity exists, where it prevents a multiplicity of suits or where an accounting on general examination into the affairs of the corporation is necessary. *Emerson et al.* v. *Gaither*, 103 Md. 564.

We doubt whether any case can be found which sustains the jurisdiction where it appears as here on the face of the bill that the effort is to recover for a single definite and known sum, where no accounting or discovery is needed, and where there is no possible pretense of saving a multiplicity of actions.

. (*b*) The main contention, however, of the appellee below was that the whole frame work of this bill showed it to be a suit to recover misappropriated trust funds, and to hold liable those who by active aid or negligence made the misappropriation possible. The appellee thus seeks to bring. the case within the rules laid down in the cases of *Duckett* v. *Bank of Baltimore*, 88 Md. 8, and the *Safe Deposit and Trust Company* v. *Roberts*, 102 Md. 630. The rule on which these cases are based we do not seek in the least to controvert, but the facts of both those cases are quite different from those in the case now presented.

In both the Duckett and Safe Deposit and Trust Company cases, this Court was dealing with express trusts, created under wills, with named trustees who held on definitely defined trusts. In the present case the plaintiff can not contend for anything more than an implied trust, arising from a supposed intention of the parties nowhere clearly expressed, and we contend that after the money was checked out to the order of Hammond it was not subject to any trust at all.

The appellees argue that the $300,000 deposit must be treated as a trust fund held by Hammond as trustee, and impressed with a trust by virtue of which it could only properly be used to pay for materials and labor entering into the construction of plant No. 2, and that the building committee was

bound to see that the money was so used by Hammond even after the same was paid over to him.

We say that there is nothing in the building agreement to warrant any such construction. That agreement distinctly provides that the money which may be obtained through any loan secured on the said bonds shall be delivered to the party of the first part from time to time as the work progresses, upon orders of the building committee.

If there is any trust resulting from this agreement and impressed on this fund it is a trust in favor of Hammond, the contractor. This money was ultimately to become his. When once paid to him it was under the true construction of this agreement his money, his pay for this work, to be used by him as he saw fit. It is true that in consideration of this money and other sums, he was under contract obligation to perform certain things for the company, but there was nothing in law or equity to bind him to use for the doing of these things the identical money which came to him from the Ice Company. He could equally well have fulfilled his whole duty to the Ice Company by doing their work with money received from other sources, and using the money which they paid him for his own personal purposes. In fact, as we all know, this is what almost every large contractor does. Current receipts from one piece of work are used to meet current bills whether arising out of that piece of work or some other entirely independent matter. As long as the contractor is solvent there is no impropriety in his so doing, still less any illegality. The bill in this case does not allege that Hammond was insolvent, or that he ever defaulted on his contract to build the plant. Hence Hammond had a right to use his pay as he saw fit.

To extend the doctrine of trust funds, or funds "impressed with a trust" in the way in which the appellees seek to do in this case would most seriously interfere with many of the ordinary operations of business. In fact the same reasoning would apply to every case where one party to a contract pays money in advance for work to be done or materials to be furnished thereafter by the other party.

If I order a coat of my tailor and give my check in advance, he takes my money according to the appellees' line of argument "impressed with a trust" to use that identical money for paying for the cloth which goes into it and the wages of the workmen who make it. If the check contain a memorandum on its face showing that it was given for a coat to be made thereafter, and if the tailor deposits this check and immediately thereafter draws out this same money to pay his rent to his landlord, who knows of the source from which it came, then according to the appellees' reasoning, the landlord who receives this money, and both of the banks through which the check passed, are liable over to me on the theory that they have aided or participated in the diversion of a trust fund.

It may be that by clear and express agreement, parties may, when making a payment, create a trust in the money so paid, even in the hands of the payee, but such an arrangement is the exception and not the rule, and there is nothing in the building agreement in this case to show any departure from the ordinary rule that a payment is presumed to vest the money paid absolutely in the payee.

The appellee may contend that there is language in the loan agreement, "Exhibit E," which would have the effect of creating such a trust. That agreement, however, is not the controlling paper. It does say that the $300,000 is to be withdrawn on checks of Hammond, accompanied by orders of the Building Committee, and to be used on account of the erection of Plant No. 2. These seem to us nothing more than mere descriptive words specifying the ultimate object which the parties had in view, and taken in connection with the building agreement which authorizes absolutely payment to Hammond, it can not be said that the language given above was sufficiently definite to impress a trust on said money, which should continue even after it passed into the hands of Hammond, the payee, or was paid out to third parties on his order.

In any event "Exhibit E" is an agreement drawn for the protection of the City Trust and Banking Company which was lending the money. It is not an agreement drawn for the

benefit of the Ice Company. The Ice Company is not even a party to it, and is clearly not in a position to claim any benefits under it whatever. Even if it imposed a limitation on the use of this money, it was a limitation imposed by the building committee and Hammond upon themselves and which they had a right by mutual consent to abrogate at any time, and did in fact abrogate by subsequently paying the checks mentioned in the various bills. The only party who might have complained of this was the City Trust Company, which was the only other party to the agreement. The Ice Company has no standing to complain of a breach of "Exhibit E," even if there were a breach, because it is not a party to that agreement. By "Exhibit A" the Ice Company had given full control over this money to the building committee and Hammond, and had expressly authorized advance payments to Hammond from time to time without subjecting such advances in the hands of Hammond to any trust. We contend, therefore, that this fund when paid out to Hammond or Hammond's order became Hammond's money, and was in no sense of the word trust money. Therefore, there was no trustee, no trust fund and hence no diversion of any trust fund, and the whole groundwork on which the plaintiff seeks to maintain equity jurisdiction in this case fails.

2. *Misjoinder of plaintiffs.* We contend that the bills are all demurrable because of a clear misjoinder of plaintiffs. There are two plaintiffs in each case—Edward C. Carrington, Jr., receiver of the Hammond Ice Company, and International Trust Company of Maryland, trustee under deed of trust given to secure the issue of bonds.

If there is to be any recovery in this case who is ultimately to get the money recovered? If such money is to go to the general creditors of the Hammond Ice Company, then for what possible reason is the trustee under the deed of trust made a party?

If, on the other hand, the money recovered is ultimately to go to the bondholders, why is the receiver of the Ice Company made a party?

The truth seems to be that the plaintiff's counsel was himself in doubt upon the question as to what was the theory, if any, on which he could recover, and he has attempted to piece out a weak case by joining two possible, though inconsistent, claims in the same bill.

We think the clearest point in the argument is that if there is to be any recovery at all it must necessarily be for the benefit of the general creditors of the Hammond Ice Company, and that, therefore, the receiver of the company is the only proper plaintiff.

The bill alleges that the Hammond Ice Company is insolvent. All of the funds of an insolvent corporation must be distributed among its general creditors, unless there be funds which are clearly subject to some lien in favor of a certain class of creditors. How can it be contended in this case that the International Trust Company of Maryland, trustee for the bondholders, ever had any lien on the special fund of $300,000 mentioned in this suit? The International Trust Company is trustee under a mortgage which creates a lien upon the land which was to be secured for plant No. 2, and upon the plant itself and its accessories. Further than this the lien of the International Trust Company cannot go. It is true that by article 25 of the deed of trust the Hammond Ice Company covenanted with the trustee that the proceeds of the bonds should be used for the erection of said plant, but this is a mere agreement on the part of the Hammond Ice Company to do certain things with the money so received, which agreement, however, is of a kind that cannot affect the rights of the general creditors of an insolvent corporation. If the deed of trust had gone further and had provided that the International Trust Company, trustee, should actually hold the money realized from the bonds in this way a lien in favor of the Trust Company and bondholders might have been secured; but it cannot be contended that money which was subject to the control of the building committee, who were the mere agents of the Ice Company, and which money belonged to the Ice Company, should by virtue of any such covenant be taken away from the

general creditors of an insolvent corporation and applied to the payment of debts of a particular class.

Suppose the Ice Company had failed after the $300,000 had been deposited with the City Trust and Banking Company, but before any of it had been checked out. On what theory could the bondholders have claimed a lien on this money, as against the general creditors of the corporation? Courts of equity are vigilant to protect the rights of general creditors and will not allow a preference in favor of a particular class of creditors unless forced to do so by virtue of a lien created in their favor by some recognized and approved method. A corporation cannot create a lien on a portion of its funds by simply agreeing that it will use certain funds for the benefit of a certain class of creditors.

There is still a further reason why the International Trust Company is an improper party; and that is that it is clear that there is no privity between the members of the building committee, who are the defendants in this case, and the said International Trust Company of Maryland. Even if it be conceded that the members of the building committee have violated some contract obligation owing by them to the Hammond Ice Company, and even if it be further conceded that the Hammond Ice Company has violated some contract obligation owing by it to the International Trust Company, trustee, such facts give no right of action to the Trust Company as against the members of the building committee. The remedy of the Trust Company, if any, is solely against the party with whom it had its contract, that is to say, the Ice Company, and the only suit which can be maintained against the building committee, is a suit brought by the Ice Company, or its receiver, that is to say, by the party with whom the members of the building committee had their contractual relation.

In other words, if the agents of the corporation were unfaithful or neglectful, in their duties, the one to bring them to account for this is the corporation or its receiver ; and the International Trust Company, which represents certain creditors, and, therefore, stands in the position of a creditor, cannot

bring a suit against the agents of its debtor.      There is abundant authority for this proposition.      *Union National Bank* v. *Hall*, 148 Mo. 38; *Deaderick* v. *Bank*, 100 Tenn. 457; *Frost Man'fg. Co.* v. *Foster*, 76 Ia. 535; *Landiss* v. *Sea Isle Co.*, 53 N. J. Eq., 654.

All of the above cases hold that creditors of an insolvent corporation have no right to maintain a suit either at law or in equity against directors or other agents of the corporation for their misconduct, negligence or wrongful acts for the reason that there is no privity between such creditors, and such directors, or other agents.

An exception is sometimes made to the rule in cases where, after demand, a corporation, or its receiver, or assignee refuses to bring such a suit, or where it is evident from the facts and circumstances surrounding the case that the corporation or its receiver, or assignee would so refuse; but there are no facts of that kind in this case.      On the contrary, the receiver is not only willing to sue, but has actually sued in these very cases.

*3. Members of the Building Committee not Liable if they Acted in Good Faith and only Permitted Reasonable Advances, at the Request of Hammond.*      A consideration of this point involves the construction of the building agreement.      The most usual form of building agreement provides that the contractor shall receive payments as the work reaches certain stages of completion.      These stages and the amounts to be paid are usually definitely specified in the building contract.      For instance, in the ordinary form of contract for building a house, the contractor receives a certain definite sum when the foundations are completed, another sum when the first floor joists are laid, &c.      The contract in the present case resembles the ordinary form of contract to the extent that it distinctly provides for the making of advance payments to Hammond.      It directs that the bonds, or the money resulting from a sale thereof, or the money which may be obtained through any loan secured thereon, shall be delivered to Hammond in installments, from time to time, as the work on the plant progresses upon orders or certificates of said building committee; until the completion

and acceptance of the plant, when all the balance of said bonds or cash and stock shall be delivered to Hammond. The building contract does not, however, specify how much in value was to be advanced to Hammond, nor does it determine the exact stages of completion which the work must have reached to justify the making of the advances. What then is the result of a contract of this kind which authorizes a building committee to make advances, but specifies neither the amounts nor the time of the same ? There is, we submit, only one construction which can be placed on it; that is to say, that the matter is left to the discretion of the building committee, and they are at least authorized to make reasonable advances at reasonable times, having due regard to the objects to be accomplished, which objects were, as we contend, to allow Hammond reasonable advances to enable him to finance the operation, and at the same time not to allow him to have the whole contract price until the building of Plant No. 2 was completed; or, putting it in another way, to reserve a reasonable margin to secure the completion of the work.

The question then is did the members of the building committee permit unreasonably large advances to Hammond ? The bills do not so allege. The total amount advanced under the four bills contained in this record is $76,100. While this amount in itself might seem large, it is relatively small when compared with the total amount involved in this contract, that total being $4,200,000. Was it unreasonable then for a building committee invested with the broad powers conferred upon them by the agreement (Exhibit A), to permit advances to Hammond of less than two per cent. of the amount involved in the contract, and particularly so when the whole plan of the building agreement shows, and it was evidently understood by all of the parties that Hammond would need advances to do the work, and it appears that all of the agreements were drawn in order to devise a plan which would permit the making of liberal advances to him ? Even if the members of the committee were guilty of an error in judgment, they would not be liable therefor. *Clark and Skyles on Agency*, sec. 399.

The appellee's theory seems to be that the building com-
mittee were under obligations to watch and trace every dollar
which Hammond got, and to see to it at their peril that every
dollar so received by Hammond went into the erection of this
plant.  We submit that there is nothing in the agreement
which justifies any such construction; that it is unreasonable to
suppose that the members of the committee were bound to
watch the matter in any such detail.   On the contrary, all
that was required of them by the spirit of the agreement was
a general supervision over the matter, and the making of ad-
vances not unreasonably large under all of the circumstances
of the case.

Neither does it clearly appear from the bill that the bond-
holders, or anyone else, sustained any loss by reason of the
payments made to Hammond, or to Mr. Hammond's order.
The bill does not state how far Hammond had proceeded with
the work of erecting a plant at the time the company became
insolvent, but it does appear from paragraph twelve of the
bill that the work done on plant No. 2, realized enough
money, even under a foreclosure sale, to pay a dividend of
nearly fifteen per cent on the bonds.

The bill does not show how many bonds were outstanding
nor what total sum was received for the sale of the unfinished
plant; but it was evidently a sum of many thousand dollars to
produce such a dividend, and if the plant in its unfinished con-
dition was worth as much, or more than the total sums re-
ceived by Hammond, then clearly neither the general creditors
of the Ice Compay nor the bondholders of the company have
sustained any loss, and without clear allegations in the bill to
the effect that the value of the plant in its incomplete condi-
tion, as sold under any foreclosure, was less than the amount
of money paid Mr. Hammond under various advances, then,
evidently the plaintiffs have no case, for in such event, they
show no loss.

*Edwin G. Baetjer* (with whom were *R. M. Venable* and *C.
McH. Howard* on the brief ), for the appellees.

    1. The principal ground of equitable jurisdiction invoked in

the present case is the well settled principle that all persons knowingly participating in a breach of trust, or participating under such circumstances that they will be charged with knowledge on account of their own negligence, are equally liable in equity for the consequences of such breach. Illustrations of this principle from our own reports will show that in no State is this doctrine better recognized or more strictly enforced than in Maryland. Corporations permitting transfer of stock held by a trustee. *Marbury* v. *Ehlen*, 72 Md. 206; *Stewart* v. *Firemens Ins. Co.*, 53 Md. 564. Bank purchasing promissory note payable to a trustee. *Third Natl. Bank* v. *Lange*, 51 Md. 138. Payee knowingly receiving trust funds in payment of a debt, and bank permitting such payment. *Swift* v. *Williams*, 68 Md. 236; *Cf. Mallery* v. *Quinn*, 88 Md. 38, 47. Bank putting to individual credit of payee the proceeds of a check drawn to the order of its cashier, to deposit to the credit of the payee as "trustee." *Duckett* v. *Mech. Bank*, 86 Md. 400. Bank which had loaned trustee on a pledge of bonds, repaying itself out of a check drawn in payment for the bonds, which check showed on its face that it was a trust fund. *Duckett* v. *Bank of Balto.*, 88 Md. 8. Brokers disposing of stocks for trustees committing breach of trust. *Safe Deposit Co.* v. *Cahn*, 102 Md. 530.

This general principle is so well established that citations are hardly necessary for its support. It is not confined to cases of conventional or express trusts, but it is a fruitful source of equitable jurisdiction, and funds in the hands of agents, wrongdoers and other parties are treated as trust funds for the application of this rule. It is, in fact, an illustration of that numerous class of cases in which equitable rights and remedies are worked out on the theory of implied or constructive trusts. 3 *Pomeroy Eq. Jur.*, sec. 1235.

The present case, however, is, to all intents and purposes, one of a conventional trust. The proceeds of these bonds were dedicated in the mortgage itself to the specific purpose of being applied to the construction of the proposed plant on the property. In addition, however, to the specific purpose of

the provisions of the mortgage itself, the collateral or contemporaneous contracts and agreements (which it is alleged were made as part of the general scheme) accurately define the specific manner in which this trust was to be enforced and carried out. When, therefore, this money was deposited with the City Trust and Banking Company, to be held and applied under the terms of these papers, it constituted, in the strictest sense of the words, a trust fund for the protection of which the building committee was constituted, and of which they, therefore, may be regarded as the trustees, though, for the purposes of this suit, it is unimportant whether they be considered as the trustees themselves or as trustees in the sense in which equity applies the doctrine of a trust to all persons aiding and abetting in the diversion of a trust fund.

Having accepted the duties of this office, the building committee were charged with the duty under the terms of these instruments, both to the corporation itself (The Hammond Ice Company) and to the bondholders, of seeing that the money was applied in the manner provided.

For its misapplication both the members of the committee participating, the contractor drawing the money out for purposes other than those to which it was dedicated, and the payee knowingly receiving the money, are all responsible and accountable to those injuried by the breach of trust. "Generally speaking a purchaser becomes a party to a breach of trust (by an executor) by buying or receiving in pledge any part of the personal assets in satisfaction of his private debt." *Salmon* v. *Clagett*, 3 Bland, 125, 170.

That the case stated by the bill is one for equitable jurisdiction, and not one for which there is a remedy at law, is apparent. It will be noticed that the bill alleges that the moneys withdrawn were not only diverted from the express purposes of the trust, but further alleges that they were entirely diverted from the corporate purposes of the company and were applied in payment of individual debts of the defendant, Ormond Hammond. So far as this presents an additional ground or cause of action on the part of the company, as represented by

its receiver, such action, as against the defendants constituting
the building committee, would be the subject of equitable jur-
isdiction on account of the fiduciary character and duties of
officers and directors in a corporation; and upon this ground
it has been well settled ever since the decision by LORD HARD-
WICK in 1742 in the case of *Charitable Corporation* v. *Sutton*,
reported in *Thompson's Liability of Directors, &c.*, page 222,
that for mismanagement, neglect, and so forth, of directors of
a corporation, they may be held to account in equity. Such
is the well-settled doctrine in this State. *Fisher* v. *Parr*, 92
Md. 245, 261; *Booth* v. *Robinson*, 55 Md. 419.

And while it is true that, if the money was totally misapplied
from the purposes of the corporation, the payees who receive
the same with knowledge would doubtless be liable in an action
at law to the company or to its receiver under the common
count for money had and received, by virtue of the principle
that an action on such a count is "equally remedial with a bill
in equity;" yet it is evident that only in equity can the liabi-
lities of all the parties participating be determined in the pres-
ent case.

2. As to the objection that there is no privity between the
defendants and the bond holders, or their representative, the
trustee under the mortgage, sufficient to entitle the latter to
maintain this bill. The technical privity which is necessary to
support an action at law for the breach of a contract, is not
necessary in creating the relation of trustee and *cestui que trust*.
All that is necessary in such cases is that the intention should
sufficiently appear, and when a trust is once so created bene-
ficiaries not parties to the instruments creating and evidencing
it, or even unborn at that time, may sue in equity for breaches
of trust committed even before they came into existence.

The question, therefore, is not whether the mortgage bond
holders or their trustee were parties to the particular agree-
ments which designated the manner in which the provisions of
the mortgage requiring the proceeds to be applied to the im-
provement of the property should be carried out. The pro-
ceeds of these bonds having been impressed with a trust by

the provisions of the mortgage itself, and these other agree-
ments being executed for the purpose of carrying out these
provisions of the mortgage, the defendants who accepted the
office of a committee under these agreements assumed the
charge of a trust fund; and they, as well as the other defend-
ants who more directly benefited by its misappropriation and
diversion, are responsible to the bondholders or their repre-
sentative on this theory, and not as in an action at law where
the sole question would be as to who was entitled to sue for
breach of a contract.

The receiver, therefore, as the representative of the corpor-
ation, is entitled to maintain these suits, both because the
company was one of the parties for whose benefit the special
trust was created, and also because it is alleged that the money
was diverted not only from the specific purposes to which it
was pledged by the agreements, but also from the general cor-
porate purposes of the company. The bondholders, whether
in person or through their trustee as their representative, are
entitled to sue as the parties for whose benefit the trust was
created ; and would be so entitled even if the breach of trust
had been participated in by the company itself in such a man-
ner as to estop it from suing the other parties participating.

3. Whether the joinder of the receiver and of the trustee
for the bondholders as plaintiffs in one bill is multifarious.
We have already considered the question whether the misap-
propriation complained of is one for which both the company
itself (as represented by its receiver), and the bondholders (as
represented by their trustee) are entitled to sue in equity, and
whether the objection of misjoinder because of want of any
interest or title to sue on the part of either of the plaintiffs, is well
taken. Under this objection, therefore, we will consider solely
the question whether, assuming that both the receiver and the
trustee have grounds for the equitable relief prayed against
the defendants, such claims constitute separate and distinct
demands which should be made the subject of separate and
independent bills against the defendants, and the joinder of
which in one suit is multifarious.

The mere statement of this objection, in the above form, is, it seems to us, a sufficient refutation.   The misappropiation complained of in each bill, as a wrong against the company and its bondholders, was a single act, and while the rights of the two complainants in the fund diverted are not identical, and the company does not represent the bondholders, or *vice versa*, for the purposes of this litigation, yet it is evident from the very nature of the case that the question of the liability of the defendants to restore the trust fund diverted, as against the equities of both plaintiffs, is one that must necessarily be determined and adjusted in a single proceeding.   If separate suits could be maintained, then either the defendants could be held twice liable for the same misappropriations, or else in such separate and independent suits the Court could determine the respective rights of the two plaintiffs in the fund, in causes in neither of which they were both parties.   Both plaintiffs are, therefore, not only proper, but necessary parties to the bill, and, upon the case as stated, a demurrer for nonjoinder would be sustained, if either were omitted.   But even if such a joinder were not necessary, multifariousness is in all cases a question of convenince rather than of strict right, and convenience would justify such joinder, in order that a final determination could be made.   *Miller's Equity*, sec. 104, etc.

BOYD, J., delivered the opinion of the Court.

There are nine appeals in this record, which were argued together.   Four bills of complaint were filed by Edward C. Carrington, Jr., receiver of the Hammond Ice Company, the Assets Realization Company and the International Trust Company of Maryland, trustee.   For convenience we will refer to them by number as they appear in the record.   In the *first* the Thomas C. Basshor Company, Ormond Hammond, Patrick Martin, William H. Evans, C. H. Basshor, and Frederick Dallam were defendants; in the *second* the De La Vergne Refrigerating Machine Company, Messrs. Hammond, Martin, Dallam and Charles T. Westcott were defendants; in the *third* Messrs. Hammond, Martin, Basshor, Evans, Dallam and John A.

Sheridan were defendants, and in the *fourth* Messrs. Hammond, Martin, Evans and Dallam were defendants. The four bills are substantially the same, excepting in the tenth and eleventh paragraphs and in some particulars mentioned in an agreement of solicitors. Only the first was inserted in the record, together with the titlings of· the other cases, the names of the defendants and the two paragraphs just mentioned. The Assets Realization Company was a holder of 354 bonds issued by the Hammond Ice Company, and ·the International Trust Company is the substituted trustee, under a mortgage or deed of trust given to secure bonds of the Hammond Ice Company. Messrs. Westcott, Martin, Evans, Basshor and Dallam composed the building committee of the Hammond Company and Mr. Hammond was the contractor for building an ice plant to be known as Plant No. 2 of that company. It is alleged in the first bill that moneys were improperly paid to the Thomas C. Basshor Company by Hammond, upon the authority and order of the other defendants in that case; in the second that they were likewise paid to the De La Vergne Refrigerating .Machine Company by Hammond, on the orders of the other defendants; in the third, that· they were so paid to John A. Sheridan by Hammond on the order of the other defendants, and ·in the fourth, that they were so paid to Hammond on the orders of those defendants.

As the appeals before us are from orders overruling demurrers, interposed by the defendants, and as they practically present the same questions, we will now consider the first bill mentioned and will then briefly refer to the fourth, as the appellants claim there is some distinction between it and the other three. The first alleges that the Hammond· Ice Company, being about to build and equip another plant for the manufacture of ice, in order to provide the funds determined to issue 1,400 bonds of $1,000 each to be secured by a mortgage or deed of trust; that in the mortgage the company covenanted with the trustee and the holder of the bonds that the proceeds from them should be used for the purposes therein set out *and none other*—the purpose ·being to build and equip

a complete new plant of a designated capacity, to purchase and acquire the necessary ground, property and materials for the erection and construction of storage houses and of a stable and to purchase and acquire all necessary and suitable ice wagons, trucks, horses and harness. A contract between the Hammond Ice Company and Hammond, which is spoken of in the bill and other papers as "Exhibit A." is filed, whereby Hammond undertook to do all that was to be done with the money as stated, and also to provide $125,000 working capital for the use of the company. In Exhibit A the company authorized the building committee to enter into such contracts as might be necessary to obligate the company to deposit the entire issue of bonds with a syndicate manager, but they were not to be sold at less than eighty per cent of their par value.

The building committee and Hammond were authorized to place any or all of said bonds, or the cash received from them, as security for any advance or loan which they thought wise and proper to make or obtain, for the purpose of facilitating the purchase and acquisition of the real and personal property and the erection of the plant. The consideration for what Hammond undertook to do was $1,400,000 of bonds and $2,800,000 of stock, and it was agreed in Exhibit A that the bonds, or the money derived from the sale thereof, or from a loan secured by them, and the stock "shall be delivered to the party of the first part (Hammond) *in installments from time to time as the work on the plant progresses, upon orders or certificates of said Building Committee* until the completion and acceptance of said plant," when the balance and the stock were to be delivered to Hammond, less $125,000 capital.

Other papers, including a prospectus, agreements, etc., are referred to and one of the agreements was between the City Trust and Banking Company, the building committee, acting on behalf of the Hammond Company, and Ormond Hammond, by which a loan of $300,000 was secured and placed to the credit of Hammond in a special account "to be withdrawn upon checks executed by him, accompanied by certificates or orders of the building committee, and to be used on account

of the purchase and acquisition of the property, real, personal and mixed, and the erection of the plant known as Plant No. 2 in Baltimore City, and the storage houses and other property and effects incident thereto, which are particularly described in the said Exhibit hereto attached, as Exhibit A."

The bill then charges that on November 20th, 1902, Hammond drew a check upon the account to the order of the T. C. Basshor Company for $21,000 and the other defendants executed and delivered contemporaneously with the check, an order and certificate directing the payment thereof out of said special account, and the check was paid to that company. It is then specifically alleged that the check was not given for anything in connection with the construction, equipment, or acquisition of Plant No. 2, that at the time the work of acquiring property and constructing the plant had not been begun, no payment was due under Exhibit A nor was the check given for any of the purposes to which, by the terms of the mortgage and contracts, the fund on deposit in said special account was to be devoted, "but it was in fact given in payment of personal debts of said Hammond to the said Thomas C. Basshor Company, wholly unconnected with the construction of said Plant No. 2, or the acquisition of property therefor." It is alleged that the company, Hammond and C. H. Basshor had full notice and knowledge of the purposes for which the fund was deposited and to which it was devoted, and that the payment of the check was a diversion of said fund from said purposes, and that Messrs. Martin, Evans and Dallam "had also full knowledge of the fund out of which said check was being paid, and at the time of the issue of the said certificate either knew that said check was not given for any of the purposes to which said fund was devoted, or made no inquiry and recklessly and negligently executed and delivered the said certificate." It further charges that the Hammond company became insolvent, default was made in the payment of the interest on the bonds, the property was sold and the proceeds paid a little less than 15 per cent on account of the bonds, which remain unsatisfied and unpaid, except to the ex-

tent of that dividend, and claims that the defendants are jointly and severally liable and accountable for said entire sum of money with interest.    The bill prays that the defendants and each of them be required to bring into court and to pay the plaintiffs the said sum of $21,000 with interest from November 20th, 1902, and for general relief.

The demurrers allege the following grounds :    1. That the plaintiffs have not stated in the bill such a case as entitles them to any relief in equity :    2. That there is a misjoinder of plaintiffs and that the Assets Realization Company and the International Trust Company of Maryland, trustee, are improperly joined therein because there is no privity between them and the defendants, to enable the plaintiffs to maintain said bill against the defendants :    3. That the bill is multifarious because of the joinder of the several plaintiffs therein :    4. For other reasons to be shown at the hearing.    The demurrers were sustained as to the Assets Realization Company, and the bill dismissed in so far as it was the bill of that company, and were overruled as to the other two plaintiffs.    From that action of the Court the defendants appealed.

The agreements filed as exhibits with the bill sustain the allegations made therein, in reference to their contents.    In addition to the one between the company and Hammond, known as Exhibit A, there was one made between the building committee, Hammond and a certain Frank J. Kohler, who was designated the "Syndicate Manager," which is called Exhibit D, and another was made between the City Trust and Banking Company, the building committee and Hammond, called Exhibit E.    Exhibit A was expressly made a part of each of those and both were signed by all the members of the building committee, as well as by Hammond.    It was by the last one (Exhibit E) that the loan of $300,000 was provided for and it was placed to the credit of Hammond with the Trust Company, with the provisions as to the withdrawal of the money above set forth.    Large powers were vested in the building committee by the Hammond Company, and the members of that committee were fully advised as to the terms of

the agreements, including their duties, powers, etc. By Exhibit A they were authorized by the company to enter into such contracts and agreements as were necessary for the sale, use, or disposition of the bonds, including a loan to be secured by them for the purpose of facilitating the purchase and acquisition of the property and the erection of the plant, and Exhibit E refers to the powers and authority vested in them by Exhibit A to make or secure loans or advances. As that committee was authorized to act for the Hammond Company, any contracts made by them within the power and authority granted them, would, of course, be binding on the company. Whether or not they had knowledge of what the check to the T. C. Basshor Company was given for, or recklessly and negligently executed and delivered the certificate, is a question of fact, but for the purposes of the demurrers must be assumed to be true. The first question then is, whether a Court of equity has jurisdiction to give relief, if the facts be as alleged in the bill, which we must assume to be true.

It would seem to be clear that this deposit must be treated as a trust fund. It was a special deposit, to be used for specific purposes and could only be withdrawn in a way clearly designated. The Hammond Company had covenanted with the trustee and the bondholders that the proceeds of the bonds should be used for the purposes named in the mortgage *"and none other,"* and in order to protect the company and the bond holders the agreements above referred to were entered into. Although Mr. Hammond was the president of the Hammond company, in this transaction he was a contractor and the building committee represented the company and at the same time undertook to do what would be necessary for the protection of the bond holders. Hammond was a party to the several agreements and knew he had no right to use the money excepting for the purposes designated. It is true it was deposited in his name, but it could not rightfully be withdrawn excepting for some of those purposes and then only on the order or certificate of the committee. Even if he had partly performed his contract, Hammond was not authorized

to withdraw any of the fund upon his own checks, but was required to accompany them by the certificates or orders of the building committee and that committee had no authority to give such certificates or orders excepting "in installments from time to time as the work on the plant progresses."

This fund was therefore as clearly impressed with a trust as if it had been in terms delivered to the committee *in trust*, to be paid out according to the terms of an instrument creating such trust. If that be not so then such arrangements (intended to enable a company or individual to borrow money for the purposes of purchasing property and erecting improvements thereon) could never be made, as no judicious investor would accept the bonds, especially to such a large amount. "Wherever there is a fiduciary relation, although the fiduciary may not hold the legal title to property, in which the beneficiary has only an equitable estate, the dealings of the parties with each other and with the subject matter of the relation are governed by the same rules which determine the duties of actual trustees towards their *cestuis que trustent*, and the beneficiaries are, in general, entitled to the same remedies which are given to *cestuis que trustent*, against those who are truly express trustees." 3 *Pomeroy's Eq. Juris.* 1088. And after stating that the equitable obligations resting upon, and the equitable remedies given against guardians, committees of lunatics, directors, partners, agents, etc., are analagous to those resting upon and given against actual trustees, the author says; "they result direct from the theory of trusts, and are not *mere* applications of the doctrine concerning accounting." Can it be denied that the company, or the trustee representing the bond holders, could have sought the aid of a Court of equity, if it had been discovered before the money was paid out that Hammond was going to check upon it, or any part of it, for his own purposes, and that the committee was about to give him a certificate to enable him to do so ? Clearly not, and for the obvious reason that a Court of equity would treat the fund as impressed with a trust. Why cannot that Court grant then relief to require them to restore what has been impro-

perly diverted from the purposes for which it was thus set apart ?

"It is well settled that every violation by a trustee of a duty which equity lays upon him, whether wilful and fraudulent, or done through negligence, or arising through mere oversight or forgetfulness, is a breach of trust.    The term, therefore, includes every omission or commission which violates in any manner either of the three great obligations already described; of carrying out the trust according to its terms, of care and diligence in protecting and ·investing the trust property, and of using perfect good faith.    This broad conception of breach of trust and the liabilities created thereby are not confined to trustees regularly and legally appointed ; they extend to all persons who are acting trustees or who intermeddle with trust property."    2 *Pom.* sec. 1079.    That statement of the principle applicable to such cases has been approved by this court in *Duckett* v. *Mechanics Bank,* 86 Md. 403.    Inasmuch as the building committee was appointed for the purpose of representing the Hammond Company and its members undertook the performance of the duties devolved on them by the agreements we have referred to, it would seem clear that they would at least be liable to the company to the same extent that managing officers of a corporation would be.    In 3 *Pom.* sec. 1088, etc., the author has under consideration corporation directors, officers and other *quasi* trustees, and he concludes a discussion as to trust relations in stock corporations as follows : "Directors and managing officers, in addition to their functions as mere agents, occupy a double position of partial trust ; they are *quasi* or *sub modo* trustees for the corporation with respect to the corporate property, and they are *quasi* or *sub modo* trustees for the stockholders with respect to their shares of the stock."    *Ibid.* sec. 1090.    When the management of an important undertaking, such as this, is placed in the hands of a committee, the principles announced by Mr. Pomeroy are as applicable to the members of the committee as they would be to ordinary managing officers.    They are "*quasi* or *sub modo* trustees for the corporation with respect to

the corporate property" placed under their control, and under such circumstances as we have in this case they should at least be held to the same liability to the bond holders, or their representative, the trustee, as directors and managing officers are to stock holders for their stock, for they had undertaken to see that this money, which primarily belonged to the Hammond company, should be applied to no other use than those provided for in the deed of trust and the contracts. The members of the committee who either knowingly or through carelessness or negligence permitted Hammond to divert part of the fund would, under the principles above announced, be amenable to the company as well as to the trustee. There could be no doubt that Hammond would be, and it would seem to be equally clear that the T. C. Basshor Company would. It was said in *Duckett's case, supra*, "There is in such instances no primary or secondary liability as respects the parties guilty of, or participating in the breach of trust ; because all are equally amenable." And it was said in *Safe Deposit Company* v. *Cahn*, 102 Md. 535, that "It is a general principle that all persons who knowingly take part or aid in committing a breach of trust are responsible for the money thus withdrawn from the trust estate, and they may be compelled to replace the fund which they have been instrumental in diverting." The Basshor Company is alleged to have used the check in payment of an individual debt of Hammond due it, and it is charged that it had full knowledge of the purposes to which the fund was devoted and that the payment of the check was a diversion of said fund from those purposes. It was suggested by the appellants that to hold the Basshor Company to such liability would interfere with the ordinary transactions of business, as Hammond might have had that much due him for money he had already spent, for the purposes for which the fund was to be used. But the bill alleges not only that the work of acquiring property and constructing the plant had not been begun and no payment was due him, but that the Basshor Company knew that the payment of the check was a diversion of the fund from the purposes for which

it was intended. So without citing other cases which have been decided in this Court, which furnish illustrations of what it has determined to be breaches of trust, we are of the opinion that the allegations in the bill are sufficient to give a Court of equity jurisdiction, and to require the defendants to answer.

2. The second ground of demurrer was that there was a misjoinder of plaintiffs, and that the two corporations were improperly joined because there was no privity between them and the defendants, to enable them to maintain the bill against the defendants. As we have said, the demurrers were sustained as to the Assets Realization Company and hence we are only required to consider this question as to the International Trust Company. It is not necessary in order to sue in equity that the same technical privity exist as might be required in order to sue at law. In this mortgage there is a covenant by the company with the trustee that the proceeds of the bonds should be used for the purposes named, and for none other, and from what we have said in discussing the subject of jurisdiction, it will be seen that in our opinion any portion of the $300,000 that may be recovered should be applied towards the payment of the bonds, as it was a fund deposited in a special account which was to be applied to the purchase and improvement of property covered by the mortgage. The trustee, as the representative of the bond holders, is interested in the recovery of the money which has been diverted from the trust, and under the circumstances its right to be a party plaintiff cannot be defeated on the theory that there is no privity between it and those alleged to have been responsible for the diversion. As is well said in the brief of the appellees, "The proceeds of these bonds having been impressed with a trust by the provisions of the mortgage itself, and these other agreements being executed for the purpose of carrying out these provisions of the mortgage, the defendants who accepted the office of a committee under these agreements assumed the charge of a trust fund, and they, as well as the other defendants who more directly benefited by its misappropriation and diversion, are responsible to the bond holders or their repre-

sentative on this theory, and not as in an action at law where the sole question would be as to who was entitled to sue for breach of a contract."

The receiver, as the representative of the company, is entitled to unite in the suit because it was also one of the parties for whose benefit the special trust was created, and it is his duty to aid in the recovery of any funds that belong to the company. It may be that all that may be recovered, if anything, will be applied to the payment of the bonds, but it will to that extent extinguish the indebtedness of the company. If all of this fund had still been on deposit when the receiver was appointed, and Hammond was not entitled to it under the terms of the agreement, the receiver would have collected it, but it would have been subject to an equitable lien in favor of the bonds, and both are now interested in having that which is alleged to have been improperly diverted restored by those responsible for its diversion.

3. Nor do we think there is a misjoinder of parties. It is certainly to the advantage of the defendants that these plaintiffs join in one suit, rather than subject them to the annoyance and risk of two suits. They cannot be injured by the joinder of the two. It is a general rule of equity that "all persons having an interest in the object of the suit ought to be made parties." *Millers Eq. Procedure*, 26 and cases cited. In *Phelps Jurid. Eq.*, sec. 41, it is said "It has been seen that plaintiffs having conflicting or alternative interests cannot be joined. But if plaintiffs several interests are not antagonistic, it matters not that they are distinct, and unconnected plaintiffs may join where there is one connected interest among them all centering in the point in issue." There is no conflict between the plaintiffs, but on the contrary the theory of the bill is that the fund was impressed with a special trust for the benefit of the bonds which both are interested in having paid. For other cases on the subject of multifariousness, see *Peters* v. *Van Lear*, 4 Gill, 249, *Simons Sons Co.* v. *Maryland Tel. Co.*, 99 Md. 180, and *Neal* v. *Rathell*, 70 Md. 599. In the last case it is said "While there are some general rules applicable

to this subject, all the authorities concede that much must be left to the discretion of the Court in particular cases."

4. The point is also made that the members of the building committee are not liable if they acted in good faith and only permitted reasonable advances at the request of Hammond. Of course, we know nothing of the facts, excepting such as are alleged in the bill, and in discussing the questions considered above we only assumed those so alleged to be true for the purposes of the demurrer, but it is distinctly alleged that the work of acquiring property and constructing the plant had not been begun, and no payment was due Hammond under the contract, and the check was not given for any of the purposes to which by the terms of said mortgage and contracts the said fund on deposit in the special account was to be devoted. Inasmuch as Hammond was not entitled to any of the money and the committee was not authorized to execute certificates excepting in installments from time to time as the work on the plant progressed, of course the committee was not authorized to advance money to him for his own purposes, not connected with the contract. Whether or not they had such knowledge or were so negligent, as to be liable to the plaintiffs must depend upon the proof, but we are of the opinion that the demurrers must be overruled and the cases remanded in order that the defendants may answer. We see no difference between the payments made to the third parties by the order of Hammond from those made to him, so far as the questions before us are concerned. The Court below can determine what time shall be allowed the defendants in which to answer.

> *Orders in the nine appeals (Nos. 75, 76, 77, 78, 79, 80, 81, 82 and 83, office docket) affirmed and causes remanded for further proceedings.*